In the Matter of Lawrence
S. CHARFOOS, Debtor.

Paul L. TAI, Plaintiff,

v.

Lawrence S. CHARFOOS, Defendant.

Bankruptcy No. 93–46530–S.
Adv. No. 93–4915.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Aug. 1, 1994.

Ralph E. McDowell, Bodman, Longley & Dahling, Detroit, MI, for plaintiff.

Michael D. Finn, Farmington Hills, MI, for defendant.

## OPINION

WALTER SHAPERO, Bankruptcy Judge.

### Background and Facts

On or about April 10, 1987, Defendant guaranteed the payment of a note payable to Plaintiff executed by Gazelle International, Inc. ("Gazelle") in the amount of $100,000.00, and on or about April 15, 1987, Defendant similarly guaranteed a $50,000.00 note payable to Plaintiff by Gazelle. The principal of each note was due one (1) year from the date of its execution together with ten (10%) percent interest. In this action, Plaintiff seeks to have each of these obligations declared non-dischargeable under § 523(a)(2) and (a)(4) of the Bankruptcy Code.

Plaintiff is a podiatrist who, as of December, 1986, had been practicing for fifteen years. For a substantial amount of that period, Plaintiff practiced with another podiatrist in Ann Arbor, Michigan. In association with his practice, Plaintiff began investing in pension-profit sharing or benefit plans, the investment in which required some knowledge or expertise which Plaintiff gained or possessed. Over the years, Plaintiff gained sufficient competency as an investor so that he was looked to by friends and associates with similar kinds of monies to invest for advice on what and how to invest, to the point that, as of August or September of 1986, he became a registered investment advisor under appropriate regulatory legislation. Sometime in 1986, Plaintiff had also formed a venture capital entity used as a vehicle for investing in primarily non-public companies, the main situs of which was in Vancouver, British Columbia.

Defendant is a well-known and successful trial attorney practicing primarily in the products liability and associated fields. Through his wife, Defendant became involved in Gazelle, a company that manufactured and marketed cosmetic products for women of color. In its heyday, Gazelle had offices in New York and Europe. By 1986, Gazelle products were being sold in retail outlets in the United States, France, Belgium and possibly the Caribbean. Defendant, and through him various other friends, acquaintances and/or associates, had invested substantial amounts of money in Gazelle which was in need of additional capital to continue its operations. Defendant was given Plaintiff's name as a possible source of capital for Gazelle sometime in the summer or early fall of 1986. At that time, Defendant contacted Plaintiff and had a number of meetings with him during which Defendant delivered to Plaintiff some samples of Gazelle's products and provided written information about Gazelle, its operations, and its financial status. Defendant testified that he went to a number of meetings and, at one or more of them, met other individuals who had in previous situations invested through or with Plaintiff. Plaintiff testified that initially, at least, he indicated to Defendant he was not particularly interested in Gazelle.

About the same time as those discussions regarding Gazelle were taking place, and specifically in December of 1986, a dispute between Plaintiff and his then podiatry partner erupted resulting in Plaintiff's partner obtaining a temporary restraining order preventing Plaintiff from entering his office. The lawsuit expanded to include the negotiation of terms and conditions under which Plaintiff might be bought out from his practice. The disintegration of Plaintiff's partnership practice proved to be an emotional and difficult experience for Plaintiff. Sometime in early 1987, Plaintiff concluded that his regular business lawyer who had been handling the litigation should be aided or supplanted by more experienced trial counsel. Plaintiff then contacted Defendant, a well-known litigator, to discuss the possibility

of representing him in the litigation with his partner. Defendant requested that Plaintiff send him the various lawsuit papers and other associated materials so he could decide whether or not he would undertake the representation. After reviewing the material, Defendant agreed to represent Plaintiff. On or about March 30, 1987, a "Contingency Contract" was entered into between Plaintiff and Defendant's law firm under which the latter undertook to represent the Plaintiff in the litigation for which it was to receive a legal fee in an amount equal to one-third of any recovery or settlement. The contingency agreement was modified on or about April 16, 1987, when Plaintiff and Defendant executed an addendum to their March 30, 1987 agreement which stated that, with reference to the first $500,000.00 awarded, the legal fee would be five percent, rather than one-third of all monies received as provided in the prior agreement. This addendum was added because, by the time Defendant decided to represent him, Plaintiff already had been offered a settlement of approximately $500,000.00.

Sometime around late March, 1987, after Defendant had accepted the representation of Plaintiff, Defendant and Plaintiff met to discuss litigation strategy. Also during the course of the meeting, Defendant told Plaintiff of Gazelle's capital needs, describing them as "short term". Defendant specifically asked Plaintiff to loan $150,000.00 to Gazelle stating that the Defendant would personally guarantee the repayment of the obligation. Plaintiff agreed and within a day or so transferred $100,000.00 to Gazelle, depleting his then readily available funds. A few days later, Plaintiff was able to locate an additional $50,000.00 which he then transferred to Gazelle. Both transfers occurred prior to the time that the note evidencing the repayment of that loan had actually been prepared, signed, and delivered to Plaintiff. Within a week or two after the transfers, the two notes evidencing the repayment obligations were prepared and signed by Gazelle, and Defendant as guarantor, and delivered to the Plaintiff.

With reference to any discussions on Gazelle's and/or Defendant's financial condition, at the time of or in the context of the discussions regarding the loans and any other relevant facts, the Court finds the following to be true:

(a) Plaintiff did not specifically ask Defendant for any financial information as to Gazelle or the Defendant, i.e.: a statement as to their individual assets, liabilities, income, etc.;

(b) Defendant failed to offer or affirmatively provide such financial information regarding either Gazelle or himself;

(c) Defendant failed to advise the Plaintiff to seek the assistance of independent counsel in connection with the loan transaction;

(d) Defendant failed to advise Plaintiff that his *written* consent to the loan was appropriate or advisable;

(e) The promissory notes which Defendant prepared to evidence the repayment obligation appear on the letterhead of Gazelle and state in full:

### NOTE PAYABLE

10 April 1987

For consideration received, GAZELLE INTERNATIONAL, INC. promises to pay PAUL TAI, $100,000.00 on 10 April 1988 with 10% interest.

/s/_____

Mark Grayson—Secretary/Treasurer

I hereby personally guarantee said payment.

/s/_____

Lawrence S. Charfoos

(The April 15 note was identical except for its April 15, 1987 date, its April 15, 1988 due date, and the amount of $50,000.00);

(f) No security was offered or given for repayment of the note, and there were no terms and conditions relative to the repayment obligation other than as above set forth [1];

1. Plaintiff testified that the one year due date as it appeared on the notes was not discussed at the time Plaintiff orally agreed to make the loans. Plaintiff testified that he was told or understood

(g) A factor in Plaintiff agreeing to make the loans was his newly established lawyer-client relationship with Defendant and, in particular, a desire not to do or refrain from doing something which might, in Plaintiff's mind, adversely affect that relationship; and

(h) Plaintiff was relying primarily, if not exclusively, on Defendant's guaranty of the notes, rather than on Gazelle's ability to pay.

Following the execution and delivery of the notes, Defendant continued to represent Plaintiff in the state court podiatry practice dissolution litigation. In October 1989, that litigation came to a successful conclusion, in the form of a gross settlement to Plaintiff of a $1,100,000 of which Defendant received as fees approximately $150,000.00. There were costs of approximately $120,000.00. At the time of the settlement, Plaintiff asked Defendant if he would then repay in full the amount of the loans (no payments on which had been made) out of the fees being paid to the Defendant's firm. Defendant told Plaintiff that he could not pay Plaintiff out of the attorney's fees because the money did not belong to him individually but rather to the firm.

### Law and Discussion

Under § 523(a)(4) of the Bankruptcy Code a debtor is not discharged from a debt incurred by "fraud or defalcation while acting in a fiduciary capacity". It is Plaintiff's position that a business transaction entered into between an attorney and his client creates a fiduciary relationship running from the attorney to the client. As such, the attorney owes the client certain duties and obligations, including, but not limited to, full disclosure concerning the business transaction, which Defendant failed to perform in this case. Plaintiff argues that those duties and obligations emanate from the common law and are evidenced further by applicable rules of professional conduct.

■ There can be no question that at the time the loans were made, the attorney-

client relationship existed between Plaintiff and Defendant with reference to the litigation involving Plaintiff's professional practice. State law determines the existence or nonexistence of the required fiduciary relationship. *See, In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982). Under Michigan law, a business transaction between an attorney and a client is governed by rules applicable to a fiduciary relationship. *Walters v. Pierson,* 359 Mich. 161, 101 N.W.2d 289 (1960).

The Michigan Supreme Court has held that business relationships between attorneys and clients are disfavored, and therefore, the attorney has the burden of showing full information and disclosure, freedom from restraint and "perfect fairness" on his part as concerns the business transaction. *See, Walters v. Pierson,* 101 N.W.2d at 291; *Kukla v. Perry,* 361 Mich. 311, 105 N.W.2d 176 (1960).

■ While the Rules of Professional Responsibility explicitly state that they do not create causes of action against attorneys, they can be looked to as a relevant source for determining the standard of care that may be required in a particular circumstance. As of April, 1987, the relevant provision in effect was Disciplinary Rule 5–104(A) which stated as follows:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The derivation and meaning of this rule may be seen from the following:

DR 5–104(A) was based on a lawyer's fiduciary obligation to a client:

DR 5–104(a) is essentially a restatement of the common law rule that creates a presumption of invalidity concerning business transactions between attorney and client. This presumption is based upon the attorney's fiduciary status, which dictates that the attorney main-

that the notes would be "short term" and that his impression was that "short term" meant something less than a year. Plaintiff, however, did

not protest the term when he later received the actual notes.

tain the highest degree of fairness and good faith *and obligates the attorney to come forward with convincing evidence that full disclosure was made to the client about the nature of the transaction and its effects on the client's interests.*

American Bar Foundation, Annotated Code of Professional Responsibility 205 (1979). *An attorney could violate former Michigan Code of Professional Responsibility DR 5–104(A) even if he or she had not profited from the transaction and even if the client was not financially injured or prejudiced. It was the breach of the fiduciary status that was paramount.*

Dubin and Schwartz, *The Michigan Rules Professional Conduct* p. 1–94–95 (ICLE 1994) (emphasis added).

Effective October 1, 1988, Michigan adopted Rule of Professional Conduct 1.8(a) which states:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquired the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

█ At the trial of this case, Plaintiff introduced the testimony of an expert witness named John L. Cote. He is an attorney practicing in East Lansing, Michigan with thirty-two years experience, including experience representing judges and lawyers in various kinds of litigation, including grievance work. With respect to this case, Mr. Cote concluded that: a lawyer-client relationship had been created prior to the time of the loan transaction; a fiduciary duty arose in connection with that transaction; because there was a fiduciary duty, the Defendant was under an obligation to provide full disclosure; full disclosure requires, at the very minimum, that the attorney reveal to the client the possibility that a conflict could arise because of the possibility that the loan would not be repaid and the client would look to the lawyer for repayment; full disclosure also requires that there be a complete disclosure of the financial ability of the lawyer to pay (the witness opined that the statements of the Defendant to Plaintiff at the time of the loans to the effect that Defendant had a six figure annual income and a net worth in excess of $1,000,-000.00 did not constitute the required full disclosure under any circumstances); and that the attorney must recommend that the client seek independent counsel (and in effect delay consummation of the transaction until independent counsel is obtained or until the client has the time to, and does, intelligently and free from restraint conclude that counsel will not be required). Further, it was Mr. Cote's opinion that the current version of the disciplinary rule (Rule 1.8(a) of the Michigan Rules of Professional Conduct) was nothing more or less than an articulation of the specifics of the full disclosure and fairness requirement emanating from the previous *Walters* and *Kukla* cases above cited, i.e. that even before the adoption of the current Rules of Professional Conduct (and particularly Rule 1.8(a)), the concept of full disclosure encompassed an affirmative obligation on the part of the lawyer: (1) to disclose all of the assets and liabilities of the lawyer-guarantor in a case involving an unsecured loan particularly when it is clear the Plaintiff was depending on the guarantor's promise, as Plaintiff was in this case; (2) to give the client a reasonable opportunity to seek the advice of independent counsel; (3) to obtain specific consent in writing to the transaction apart from any papers evidencing the transaction itself; and (4) to assure that the transaction be fair and reasonable to the client.

This Court finds that the Defendant did not make full disclosure to Plaintiff, that the Plaintiff was not given a reasonable opportunity to, nor counseled to, seek the advice of independent counsel before agreeing to the loan, and that Defendant failed in his affirmative obligation to obtain a writing under which Plaintiff consented to the transaction,

separate from any of the papers evidencing the transaction itself.

■ Plaintiff in fact testified that a reason he agreed to make the loan to Defendant was because of the good rapport he had developed with Defendant and his desire to continue to maintain that good relationship with him so that Defendant would vigorously litigate the case which concerned the very future of Plaintiff's professional life.[2] Defendant testified that, in fact, there really was no relationship between the loan and his prosecution of the state court case and that (as the results indicate) he carried out his obligations as Plaintiff's lawyer fully and would have done so whether or not Plaintiff made the loan. That may be entirely true. Defendant, and this argument, however, miss the point that the situation is sufficiently grounded in human nature and reality, to the point that a business transaction when between parties involved in a lawyer-client relationship imposes strong and affirmative duties on the lawyer to eliminate the necessarily inherent perception (whether expressed or not) that the lawyer's duty on the one hand to fully represent the client in the litigation might affect, or be affected by, the responsibilities and obligations created by, or arising out of, the business transaction, on the other, or there is, or might be, some nexus between them.

Defendant argues that he made full disclosure, and/or he was not required to, because Plaintiff had independent knowledge of Gazelle's and his own financial condition. Defendant testified with a measure of truth that Plaintiff in general was a sophisticated investor who had knowledge of the financial condition of Gazelle. In fact, during the period between the execution of the notes and the settlement of the litigation, Plaintiff indicated that while *he* would not make any further investment in Gazelle, he would use his best efforts to see what could be done. To that end, he made a trip to New York to visit the Gazelle headquarters, he flew to Italy to meet individuals who were prospective investors in Gazelle, and he flew with Defendant to Vancouver to discuss the possibility Plaintiff's venture capital company becoming a

vehicle, or one of a number of vehicles, which might invest in Gazelle. Defendant further testified that the Plaintiff generally knew about Defendant's "financial condition" because Defendant told Plaintiff that he (Defendant) had a net worth in excess of $1,000,-000 and had an annual income in the "middle six figure" range.

■ In this Court's opinion, what Defendant describes does not meet the full disclosure requirement under circumstances where what is being given is an unsecured loan in the amount of $150,000.00 and where, as here, the Plaintiff is relying not on the maker of the note so much as the guarantor of the note, as well as the other recited circumstances. Full disclosure requires, in this Court's opinion, a written, full and complete listing of specific assets and liabilities, a fair and reasonable estimate of the value(s) of each of the listed assets, an explanation of the kind or nature of the listed liabilities, and whether or not they are secured by any, (and which) of the listed assets, an inclusion therein of any contingent liabilities, and some information about Defendant's income and earning power. In short, full disclosure requires what one might reasonably expect to be disclosed in connection with an arms length commercial loan transaction of that magnitude, particularly where, as here, there is no prior loan history or business relationship between the parties.

■ Defendant's obligations are not ameliorated by the financial sophistication of the Plaintiff or the Plaintiff's knowledge of the Gazelle's financial condition (gained, in part, outside the context of the loan discussions), neither of which are a sufficient substitute for Defendant's affirmative obligations, at least in the context of the facts of this case.

Furthermore, Defendant did not ensure that the transactions were entered into in an atmosphere free of irrelevant (to the business transaction) considerations or unreasonable time constraints. In this case, the loan transaction followed very quickly upon the creation of the attorney-client relationship in a situation where Plaintiff felt, not unreason-

---

**2.** This testimony is not critical or necessary to the result in any event.

ably, in great need of immediate and competent representation to deal with his professional practice litigation. Very little time expired between the specific request for the loan and the actual payment of the money. For some reason, Plaintiff felt compelled to advance the initial sums for less than the full amount requested by Defendant almost immediately, transferring the remaining funds a short time later. All of the funds were advanced prior to the time the note(s) evidencing the obligations were even delivered. Effectively, Defendant had introduced a sense of urgency into the relationship with respect to the consummation of the loans. As noted, the loan transaction occurred at exactly the time when Defendant was initiating his attorney-client relationship and establishing the strategy for the litigation to come. Even sophisticated clients can be at a disadvantage in circumstances of this type. It is precisely because there is the potential for the lawyer to trade on the importance of his relationship to the client relating to legal representation (or for the client to reasonably think that such is being done) that the rules regarding attorney's business transactions with clients were established.

In this case, the situation is made worse by the actual terms and conditions of the loan repayment documents that the Defendant drafted. The documents contain the absolute bare minimum necessary to evidence the repayment obligation and do not contain any of the provisions that would normally be incident to a transaction of this size and nature in that no security was offered and no provisions that would be considered protective of the lender were included.[3] The cited Michigan cases, by their use of the language of "perfect fairness" and articulation of the concept of close scrutiny, in the context of passing upon business transactions between attorney and client, thereby seem to incorporate the provisions of current Rule 1.8(a)(1) of the Rules of Professional Conduct which, among other things, require that the *substance* of the transaction be "fair and reasonable to the client". This in essence requires inquiry into the actual terms and conditions of the notes. The terms and conditions of the notes in this case were not fair and reasonable to the Plaintiff by reason of the lack of normal commercial terms, the lack of basic lender-oriented protections, and the lack of security for repayment, if nothing else.

By virtue of all of the foregoing, this Court concludes that there was a fiduciary relationship which Defendant breached.

The remaining question under § 523(a)(4) is whether or not there was a "defalcation". In this Circuit, proof of defalcation does not require that there be any intentional misconduct on the part of a fiduciary. There is an objective standard for "defalcation", and therefore, misconduct alone is sufficient. Put differently, the procurement of the loans without the required full disclosure, in a situation where the relationship between the parties was fiduciary one, constitutes the misconduct or defalcation necessary to be found under the statute. *See, In re Kern,* 98 B.R. 321 (Bankr.S.D.Ohio 1989); *In re Johnson,* 691 F.2d 249 (6th Cir.1982); *In re Kraus,* 37 B.R. 126 (Bankr. E.D.Mich.1984).

### Conclusion

For the foregoing reasons, this Court finds that Defendant's debt to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). By reason thereof the Court does not feel the need to evaluate the § 523(a)(2) claim.

Plaintiff shall prepare and present an appropriate order.

---

**3.** With respect to the notes, for example, one might expect the inclusion of: cross default provisions; provisions for collection of fees and costs; provisions for periodic interest payments (rather than what was provided); negotiable rather than non-negotiable form; place of payment provision; waiver of presentment; choice of law provision (given Gazelle's international presence); provisions negating any obligation on the part of payee to exhaust remedies and waiver of any notice of default against the maker; and a provision to the effect that guarantor remains bound, notwithstanding any extensions, renewals, modifications entered into with the maker.